## CONTINUATION OF APPLICATION FOR SEARCH WARRANT

I, Ryan McCormick, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this continuation in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— an electronic device described in Attachment A —which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Drug Enforcement Administration ("DEA"), and have been since 2006. During my employment with the DEA, I have been assigned to the Detroit Field Division in Detroit, Michigan and the Vienna Country Office in Vienna, Austria.

3. I have been involved in the investigation of various individuals and organizations involved in the manufacturing, distribution, and use of controlled substances. I have conducted surveillance operations and have become familiar with the methods used by individuals engaged in the manufacturing, trafficking, and use of controlled substances. I received specialized training at the DEA Training Academy in Quantico, Virginia in regards to the identification of narcotic substances and the operation of money laundering and drug trafficking organizations. I have written and conducted numerous search warrants which have resulted in the seizure of large amounts of narcotics and narcotics proceeds.

4. During my employment with DEA as a Special Agent, I have also worked in an undercover capacity for the purpose of purchasing and/or receiving

controlled substances; and I have participated in the preparation of affidavits in support of numerous search and arrest warrants for violations of federal drug laws contained in Title 21, United States Code, as well as in the execution of the same.

5. I have further conducted surveillance operations of drug traffickers and have interviewed numerous persons personally involved in drug trafficking. I have also supervised numerous confidential sources during the course of carrying out drug trafficking investigations. Through this training and experience, I have become familiar with, and have gained a thorough understanding of the methods, manner and means used by individuals engaged in the unlawful manufacturing, trafficking, and use of controlled substances.

6. The facts in this continuation come from my personal observations, my training and experience, my review of written reports and information obtained from other agents and witnesses. This continuation is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7. The DEA, the Michigan State Police ("MSP"), the Kent Area Narcotics Enforcement Team ("KANET") and the West Michigan Enforcement Team – South ("WEMET") are investigating Anthony Martell SANDERS a/k/a "Money," "Big Money," "Money G," "Pooh," his brother, Amon Sudan SANDERS OUTLAW a/k/a "Baby Money," and others for distributing controlled substances in violation of 21 U.S.C. § 841(a) and conspiring to distribute controlled substances in violation of 21 U.S.C. § 846. There is probable cause to believe that the items described in

Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

8. Because this warrant application is being submitted for the limited purpose of establishing probable cause to search, I have not set forth every fact learned during the course of this investigation.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

9. On April 4, 2022, an Apple iPhone, hereafter referred to as **Sanders-Outlaw Phone 2**, was seized from Amon SANDERS OUTLAW as he entered a Jeep Grand Cherokee rental vehicle near 345 State Street, Grand Rapids, Michigan and was arrested pursuant to the below-referenced federal criminal complaint. Since being seized, **Sanders-Outlaw Phone 2** has been stored at the DEA Grand Rapids District Office so its contents are, to the extent material to this investigation, in substantially the same state as they were when **Sanders-Outlaw Phone 2** was first seized. This application seeks the issuance of a warrant to examine **Sanders-Outlaw Phone 2**.

10. The applied-for warrant would authorize the forensic examination of the **Sanders-Outlaw Phone 2** for the purpose of identifying electronically stored data particularly described in Attachment B.

11. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

12. I am including by reference, the facts encompassed in the continuation in support of the criminal complaint seeking arrest warrants for Anthony Martell SANDERS a/k/a "Money," "Big Money," "Money G," "Pooh," and his brother, Amon Sudan SANDERS-OUTLAW a/k/a "Baby Money,". See *United States v. Sanders et al.*, no. 1:23-mj-00133, R.1-1: Continuation, PageID.2-54 (the "Complaint Continuation"). I incorporate the factual allegations contained in the Complaint Continuation by reference herein. A copy of the Complaint Continuation will be provided to the Court upon its request. A grand jury has since indicted SANDERS-OUTLAW, SANDERS, and JAVON BRIDGEFORTH HOUSE for charges of conspiracy to distribute controlled substances and other drug distribution and firearm charges. *See United States v. Sanders, et al.*, No. 1-23-cr-00049, R.1: Indictment, PageID.96-109.

13. The Complaint Continuation showed that an undercover (UC) WEMET-South detective communicated with SANDERS, at 616-304-0473, to arrange for the purchase of narcotics on six occasions.[1] While SANDERS communicated with the UC directly, he sent SANDERS-OUTLAW and BRIDGEFORTH HOUSE on his behalf to deliver the drugs for the drug trafficking organization (DTO).

---

[1] SANDERS was associated to this phone number in a variety of ways, including through the execution of an iCloud search warrant associated with this phone number, which contained many self-photographs of SANDERS. I have also compared the voice on the recordings of the user of this phone to SANDERS' voice, which I personally know from encountering him during his arrest and subsequent interview on April 4, 2023, and have determined the person to be the same.

14. The UC was able to determine that SANDERS-OUTLAW was the person who delivered drugs by comparing the person he encountered with a Michigan Secretary of State photograph of SANDERS-OUTLAW.

15. SANDERS-OUTLAW delivered drugs to the UC on the DTO's behalf on four occasions: February 28, 2023 (9.8 grams lab tested as fentanyl), March 2, 2023 (30.3 grams lab tested as fentanyl), March 9, 2023 (field tested as approximately 8 ounces of methamphetamine), and March 16, 2023 (field test as approximately 6 ounces of methamphetamine.

16. During the March 9, 2023 deal, SANDERS-OUTLAW told the UC that the UC could contact him if he (the UC) couldn't get ahold of his brother. SANDERS-OUTLAW provided his phone number as (616) 890-0774 (Sanders-Outlaw Phone 1). The Complaint Continuation authorized the search of Sanders-Outlaw Phone 1 should investigators seize the device in the execution of the arrest warrant of SANDERS-OUTLAW or in the search of the residences also authorized by warrants under the Complaint Continuation.

17. Nonetheless, investigators had evidence that SANDERS-OUTLAW used another phone to communicate with his brother (SANDERS) and others, regarding drug business. Based on my training and experience, I know that drug traffickers often utilize multiple phones to discuss drug business, including having one phone for drug customers – believed to be Sanders-Outlaw Phone 1 based on SANDERS-OUTLAW providing that phone number to the UC – and one all-purpose

5

phone that they use to communicate with coconspirators – believed to be **Sanders-Outlaw Phone 2.**

18. For example, on March 2, 2023, the UC contacted SANDERS, at 616-304-0473, to arrange for the purchase of "boi," which I know from my training and experience is a coded reference to heroin/fentanyl. Later that same day, SANDERS directed the UC to 3108 Wingate Drive, Kentwood, Michigan where the UC met with SANDERS OUTLAW. During the meeting, SANDERS OUTLAW provided the UC with a substance, which DEA laboratory analysis confirmed as approximately 30.3 net grams of a mixture containing fentanyl. The UC provided SANDERS OUTLAW with $1,800 in pre-recorded funds. SANDERS OUTLAW then started calling SANDERS through the infotainment center of SANDERS OUTLAW's vehicle but quickly ended the call.

19. I reviewed toll information for telephone number 616-304-0473, used by SANDERS (Sanders Phone 1) and identified telephone number 616-256-8907 as the possible number SANDERS OUTLAW would've used to call SANDERS on March 2, 2023 during the time of the infotainment center call. Subscriber information subsequently provided by Verizon Wireless for telephone number 616-256-8907 revealed a subscriber of "Amon Sanders Outlaw." Based on my training, experience, and familiarity with the investigation, I believe (616) 256-8907 to be **Sanders-Outlaw Phone 2**. Regardless whether **Sanders-Outlaw Phone 2** has that call number, I believe there is still probable cause to search **Sanders-Outlaw Phone 2** based on the nature and circumstances of its seizure (described below), SANDERS-

OUTLAW's involvement in narcotics trafficking, and his use of multiple mobile phones to discuss drug business.

20. On April 4, 2023, investigators arrested SANDERS-OUTLAW pursuant to the aforementioned arrest warrant near 345 State Street SE, Grand Rapids, Michigan. SANDERS-OUTLAW was seated, alone, in the driver's seat of a Jeep Grand Cherokee, a rental vehicle, at the time of his arrest. Investigators located and seized approximately 77.9 gross grams of suspected Suboxone strips (buprenorphine, a Schedule III controlled substance) and **Sanders-Outlaw Phone 2** from SANDERS-OUTLAW's person. Investigators also seized $2,066.00 United States Currency in suspected drug proceeds from SANDERS-OUTLAW's person and the Jeep. Based on my training and experience, I know large sums of cash are indictive of narcotics trafficking. Finally, investigators located and seized a second Apple iPhone from in the Jeep. I later powered on the second Apple iPhone and called Sanders-Outlaw Phone 1. I was able to observe my phone number appear on the second Apple iPhone as an incoming call confirming that it was Sanders-Outlaw Phone 1.[2]

21. On the same date (April 4, 2023), investigators read SANDERS-OUTLAW his Miranda Rights. SANDERS-OUTLAW stated that he understood his rights and agreed to speak with investigators. During an interview, SANDERS-OUTLAW provided a partial phone number as his telephone number by providing the

---

[2] Because **Sanders-Outlaw Phone 2** is preserved in airplane mode, I do not wish to perform the same test to determine that its call number is (616) 256-8907.

7

numbers, 616-265-89..  SANDERS OUTLAW claimed he did not recall the remainder of the phone number.  It is my opinion that the numbers SANDERS OUTLAW provided, (616-256-89..) partially match the phone number I identified in my toll analysis as documented above, which is believed to be the phone number for **Sanders-Outlaw Phone 2**.

22. In light of the forgoing, this application seeks authorization to search **Sanders-Outlaw Phone 2** for evidence of the crimes under investigation. **Sanders-Outlaw Phone 2** has been stored so its contents are, to the extent material to this investigation, in substantially the same state as they were when **Sanders-Outlaw Phone 2** was first seized on April 4, 2023.

23. Based on my training and experience, I know that electronic devices such as **Sanders-Outlaw Phone 2** can be used to store electronic information for long periods of time.  Even if a drug trafficker is being cautious of law enforcement detection and deleting the substance of communications, significant data may still remain on the phone, such as call logs (including FaceTime on Apple devices), contact information, photographs, wireless internet connections (which can reveal location information), and other location information.

24. Further, based upon my training, experience, and participation in drug investigations and financial investigations relating to drug investigations, I am aware of the following:

8

a. Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their devices;

b. Drug traffickers sometimes use electronic messaging or messaging apps, in addition to MMS, SMS text messages, and voice call, to communicate with suppliers, purchasers, and others involved in drug trafficking on their devices;

b. Drug traffickers often take pictures or videos of their drug trafficking associates, drugs, money and/or firearms, which they store on their devices;

c. That drug traffickers often maintain, on hand, large amounts of currency in order to maintain and finance their on-going narcotics business;

d. Global Position System (GPS) data on phones may show the location of a drug trafficker at a given time, which may provide corroborating evidence of a drug delivery or other instance of drug trafficking;

e. User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the device is being used by a drug trafficker and can provide other useful evidence to the drug investigation;

9

f. Drug traffickers often use the internet to look up various information to support their drug trafficking activities;

g. That drug traffickers often have unexplained wealth and assets as they do not have a job, nor do they report income on their state or federal tax returns. Subjects often use cash, money orders, and cashier's checks, and prepaid debit cards as a way of purchasing items as a way to disguise where the funds are ultimately coming from. Subjects will place assets in the names of nominees, which are often friends and family members in an attempt to hide the true ownership of the assets. It is common for drug traffickers to maintain books, records, receipts, notes, ledgers, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them, including their devices;

h. That it is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds. This evidence includes currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts,

        records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box receipts or keys, records concerning storage lockers and money wrappers.  These and other items are maintained by the drug traffickers within their residences, businesses, or other locations over which they maintain dominion and control.

i.   That when drug traffickers amass large proceeds from the sale of controlled substances that the drug traffickers attempt to legitimize these profits through money laundering activities.  To accomplish these goals, drug traffickers utilize but are not limited to, domestic and international banks and their attendant services, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, storage lockers, safe deposit boxes and otherwise legitimate businesses that generate large quantities of currency.

j.   That the sale of controlled substances generates large quantities of United States currency in small denominations (commonly referred to as "street money").

k.   That it is common for drug traffickers to separate their "street money" by denomination and organize this currency in rubber

        banded stacks in varying $1,000 increments to facilitate quick counting.

l.    That the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and drug transactions.

m.    That drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies.  The "source" of their income reported on tax returns can be falsely stated, misleading or generic in terms.  Retained copies of these returns are commonly kept by the traffickers in their residences and businesses.

n.    That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

o.    That drug traffickers frequently receive their supply of drugs through packages sent by U.S. Mail or third-party delivery service.

## **TECHNICAL TERMS**

25.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a. <u>Wireless telephone</u>: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.

b. <u>Smart Phone</u>: A "smart phone" is one that operates as a wireless phone but also performs many of the functions of a computer, such as storing data (*i.e.*, names, addresses, appointments, or notes), utilizing computer programs and applications, accessing the internet, and sending and receiving email. Smart phones have an operating system capable of running downloaded applications including, but not limited to, word-processing applications and social media applications like Facebook and Instagram. Smart phones often include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards

13

or miniature hard drives. This removable storage media can store any digital data. Smart phones typically include global positioning system ("GPS") technology for determining the location of the device.

   c. <u>Digital camera</u>: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

   d. <u>Portable media player</u>: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

   e. <u>GPS</u>: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it

has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

   f. <u>IP Address</u>: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer and smart phone attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer or smart phone may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses. Most smart phones have dynamic IP addresses.

   g. <u>Internet</u>: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the

15

Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

26. Based on my training, experience, and research, I know that **Sanders-Outlaw Phone 2**, which is an Apple iPhone, is a "smart phone" that, in addition to serving as a wireless telephone, has capabilities that allows it to serve as a digital camera, portable media player, and GPS navigation device. Additionally, as a smart phone, **Sanders-Outlaw Phone 2** operates as a computer that can download and run multiple applications; it can connect to the internet and is assigned IP addresses when connected to the internet.

27. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device. Also in my training and experience, as well as the training and experience of other law enforcement officers with whom I work, I know that individuals involved in organized retail fraud frequently utilize wireless telephones to communicate with their co-conspirators and facilitate the fraud. I know that wireless telephones, and smart phones in particular, often contain evidence indicative of organized retail fraud, including confirmation of the telephone number associated with the device, records of incoming and outgoing calls and text messages with co-conspirators, particularly during times of active fraud activities; voicemail messages; photographs of stolen property, or intended stolen property, co-conspirators, or currency; and, in the case of smart phones like **Sanders-Outlaw**

16

**Phone 2**, GPS data indicating the location of the device at given points in time, providing evidence that the device was in the area where the fraud occurred.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

28. <u>Forensic evidence</u>: As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **Sanders-Outlaw Phone 2** was used, the purpose of its use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on **Sanders-Outlaw Phone 2** because:

  a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

  b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

  c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

  d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is

17

a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

  29. <u>Nature of examination</u>: Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of **Sanders-Outlaw Phone 2** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of **Sanders-Outlaw Phone 2** to human inspection to determine whether it is evidence described by the warrant.

  30. <u>Manner of execution</u>: Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

31. I respectfully submit that there is probable cause to believe that Anthony Martell SANDERS a/k/a "Money," "Big Money," "Money G," "Pooh," and his brother, Amon Sudan SANDERS OUTLAW a/k/a "Baby Money," and others have conspired to distribute controlled substances in violation of 21 U.S.C. § 846. I submit that this application supplies probable cause for a search warrant authorizing the examination of **Sanders-Outlaw Phone 2** described in Attachment A to seek the items described in Attachment B